AO 91 (Rev. 11/11) Criminal Complaint



# UNITED STATES DISTRICT COURT

for the

Central District of California

| United States of America | |
|---|---|
| v. | Case No. 19MJ02979 |
| DAVID BERNARDO GARCIA, | |
| Defendant(s) | |

FILED
CLERK, U.S. DISTRICT COURT
JUL 22 2019
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 18, 2019 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

ıs/
*Complainant's signature*

USPIS Inspector Alyssa J. Rodriguez
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/22/2019

ALICIA G. ROSENBERG
*Judge's signature*

City and state: Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

LODGED
2019 JUL 22 AM 9:45
BY:

## AFFIDAVIT

I, Alyssa Rodriguez, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of criminal complaints and arrest warrants against David Bernardo Garcia ("GARCIA") for a violation of Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) and Ashley Lynn Calvillo ("CALVILLO") for a violations of Title 18, United States Code, Section 1708(Possession of Stolen Mail).

2.  This affidavit is also made in support of an application to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the United States Postal Inspection Service in Pasadena, California, as described more fully in Attachment A:

      a.  A silver Apple iPhone S, FCC ID BCG-E2946A ("SUBJECT DEVICE 1");

      b.  A black LG cell phone in a black case, serial number 352439-10-372021-9 ("SUBJECT DEVICE 2");

      c.  A gray Apple iPad, serial number DMPY82LSLMPL ("SUBJECT DEVICE 3); and

      d.  A black MSI laptop, serial number K1904N00029184 ("SUBJECT DEVICE 4").

3.  The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1704 (Possession of a

Counterfeit or Unauthorized Postal Key), 1708 (Possession of
Stolen Mail), 1344 (Bank Fraud), 1028 (Fraud in Connection with
Identification Documents), 1028A (Aggravated Identity Theft),
1029 (Access Device Fraud), and 371 (Conspiracy), and Title 21,
United States Code, Sections 841(a)(1) (Distribution of and
Possession with Intent to Distribute a Controlled Substance) and
846 (Attempt and Conspiracy to Distribute and to Possess with
Intent to Distribute a Controlled Substance) (collectively, the
"Subject Offenses") as described more fully in Attachments B.
Attachments A and B are incorporated herein by reference.

    4.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrants, and search warrant, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

    5.   I am a Postal Inspector with the United States Postal
Inspection Service ("USPIS") and have been so employed since
April 2016.  I am currently assigned to the Los Angeles
Division, Pasadena Mail Theft Team, which investigates crimes
against the United States Postal Service ("USPS") and crimes
related to the misuse and attack of the mail system, including

theft of United States mail, fraud, and related activity in connection with access devices (including credit and debit cards), identity theft, and unauthorized use of personal identifying information. I completed a twelve-week basic training course in Potomac, Maryland, which included training in the investigation of mail theft, identity theft, and drug distribution. Through my discussions with other Postal Inspectors, I have learned additional information about mail theft investigations and common mail theft and identity theft practices, as well as the use of digital devices in committing related crimes.

6.   Based on my discussions with other Postal Inspectors and Team Leaders who have worked on the Prohibited Mailing and Narcotics Team ("PMN"), who combined have more than twenty years of experience, I have also learned about their investigations and knowledge of common drug trafficking practices. Specifically, I have discussed with Assistant Inspector in Charge and Former PMN Team Leader Eric Shen his experiences with drug trafficking including the tendencies and practices, as well as their use of the United States Mail, as well as other tendencies and practices of drug traffickers.

### III. SUMMARY OF PROBABLE CAUSE

7.   On July 18, 2019, pursuant to a state search warrant, Burbank Police Department ("Burbank") officers searched GARCIA, CALVILLO, GARCIA's hotel room, and GARCIA's car and found a suspected counterfeit USPS arrow key, a California driver's license in a name other than GARCIA or CALVILLO, several debit

and credit cards in names other than GARCIA or CALVILLO, a
suspected counterfeit Illinois driver's license with GARCIA's
picture, $1,700 in cash, a check in the name of N.P., and
several documents with handwritten personal identifying
information ("PII") for people other than GARCIA and CALVILLO.
Officers also found in GARCIA's hotel room approximately 447
grams of methamphetamine, 16 MDMA pills, 150 clear plastic
baggies, and a digital scale.

## IV. STATEMENT OF PROBABLE CAUSE

8.    Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

### A.    Background of Investigation

9.    On June 27, 2019, detectives from the Ventura County
Sheriff's Office ("Ventura") were conducting surveillance in
connection with a fatal overdose investigation.  During the
surveillance, the detectives saw GARCIA visit a house connected
to their investigation.

10.    Ventura detectives followed GARCIA and saw him meet
with another individual, Kevin Francis ("Francis").  The
detectives suspected GARCIA and Francis were engaged in drug-
related activity.  After learning that Francis had a warrant for
his arrest, the detectives approached GARCIA and Francis.  As
they approached, the detectives saw GARCIA holding a plastic bag
with what appeared to them, based on their training and
experience, to be heroin.  The detectives arrested GARCIA for
state drug possession crimes.

11.   As part of their investigation, the detectives obtained a state warrant to place a GPS tracking device on GARCIA's car, a dark blue Kia bearing California license plate 8BFT939 ("the Kia").  They placed a GPS tracker on the Kia shortly after GARCIA's arrest and subsequent release.

12.   On July 17, 2019, the detectives conducted surveillance on GARCIA and the Kia.  The detectives saw GARCIA and a female later identified as CALVILLO drive around, make several stops, and meet with several individuals.  Around 9:00 p.m., GARCIA and CALVILLO drove to the Glen Capri Inn Motel, located at 6700 San Fernando Road, Glendale, California 91201. Detectives saw GARCIA go into the motel office then up to room 206 with CALVILLO.  GARCIA made several trips between his car and room 206 carrying bags, a large box, and a briefcase.

13.   Ventura detectives notified Burbank officers about their observations.

**B.   Surveillance of GARCIA's Motel Room**

14.   Around 8:00 a.m. on July 18, 2019, Burbank officers began surveillance of room 206 at the Glen Capri Inn Motel, where Ventura detectives had seen GARCIA and CALVILLO enter. Around 9:00 a.m., the Honorable Judge Robert P. Applegate authorized a state search warrant for Burbank officers to search room 206, GARCIA, the then-unidentified female with GARCIA (later identified as CALVILLO), and the Kia[1], which was parked in the parking lot.

---

[1] Burbank officers searched California Department of Motor Vehicle records and learned that GARCIA is listed as a registered owner of the KIA.

15. Around 4:15 p.m., officers saw GARCIA exit room 206, holding what appeared to be papers in his hand, and walk to the Kia. GARCIA unlocked the Kia and placed the papers in the passenger seat area. Shortly thereafter, CALVILLO left room 206 carrying a small backpack. Officers saw CALVILLO place the backpack in the backseat of the Kia, get in the driver's seat, and close the door. GARCIA then got in the passenger seat of the Kia and closed the door.

16. In order to execute the state search warrant, officers approached the KIA and detained GARCIA and CALVILLO. As GARCIA got out of the Kia, one of the officers saw a large stack of mail matter on the passenger side floorboard and a Google phone box with duct tape around it. When officers initially approached GARCIA and CALVILLO in the Kia, GARCIA was holding SUBJECT DEVICE 1 and CALVILLO was holding SUBJECT DEVICE 2.

C. **Search of GARCIA**

17. Officers searched GARCIA and found the following:

a. A suspected counterfeit USPS arrow key in his right pocket;

b. A California driver's license in the name of V.T;

c. Credit/debit cards in names other than GARCIA or CALVILLO;

d. A check in the name of N.J.;

e. A Lift Master garage opener;

f. Approximately $1,700 in cash; and

g.     A wallet containing several debit/credit cards in GARCIA's name, GARCIA's California driver's license, and approximately two credit cards in names other than GARCIA.

**D.     Search of the Kia**

18.   While searching the Kia, officers found the following:

a.     Approximately 50 pieces of mail matter in names other than GARCIA and CALVILLO on the passenger floorboard;

b.     Approximately seven checkbooks in names other than GARCIA and CALVILLO inside of the Google phone box with duct tape around it; and

c.     The backpack CALVILLO was seen carrying.  Inside of the backpack, officers found several handwritten documents containing PII not belonging to GARCIA or CALVILLO, mail matter not belonging to GARCIA or CALVILLO, and approximately $363.83.

**E.     Search of Room 206**

19.   Officers went to and searched room 206.

20.   On top of the bed, officers found the following:

a.     Several pieces of mail matter in names other than GARCIA and CALVILLO;

b.     Several clear plastic baggies;

c.     Drug paraphernalia;

d.     A Best Buy receipt for a laptop;

e.     A garage door opener;

f.     Rental car keys;

g.     A clear plastic bag containing several clear plastic baggies;

h.     Prescription medication with GARCIA's name; and

      i.   A baggie containing approximately 16 pills believed, based on the officers' training and experience, to be MDMA.

21.   Inside of the room, officers found a rolling suitcase containing mail matter, handwritten documents containing PII for people other than GARCIA or CALVILLO, and other miscellaneous documents.

22.   Officers also found a leather briefcase in the room. Ventura detectives later told Burbank officers it appeared to be the same briefcase they saw GARCIA carry into room 206. The briefcase contained the following:

      a.   Approximately three bags containing a white substance resembling methamphetamine;

         i.   Officers later field-tested and weighed the substance in the three bags. The substance in all three bags tested presumptively positive for the presence of methamphetamine. The largest bag weighed approximately 362.87 grams, including the thin plastic bag. The total approximate weight of the three bags, including the thin plastic bags, is 447 grams;

      b.   Approximately 150 clear plastic baggies;

      c.   A digital scale;

      d.   Mail matter in names other than GARCIA and CALVILLO;

      e.   Blank checks;

      f.   A Radio Frequency scanner;

      g.   A Deftun card reader/writer;

      h.   SUBJECT DEVICE 3;

      i.   A lock containing the words "USPS;" and

      j.   Credit/debit cards in names other than GARCIA and CALVILLO.

23.  On the bathroom counter, officers found SUBJECT DEVICE 4, which was the same brand as the laptop on the Best Buy receipt found on the bed, and a Wells Fargo card in a name other than GARCIA and CALVILLO.

24.  In the trash can, top shelf of the closet, on the desk, and on the floor of room 206, officers found several pieces of mail matter in names other than GARCIA and CALVILLO. Next to the mail matter on the floor, officers found a Home Depot box with a HP printer and what appeared to be printed colored copies of fraudulent social security cards.

25.  Officers also found a Victoria's Secret makeup bag containing approximately 18 suspected USPS parcel locker keys and a gray backpack containing a pry bar and miscellaneous tools.

26.  Officers arrested GARCIA and CALVILLO for California identity theft and drug sales violations.

## V.  TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

27.  Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

      a.   People who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail looking for checks, access devices, other personal identifying

information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.    It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

c.    Often times mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

d.    It is also common for mail and identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

e.    It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

f.    Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

g.    Individuals engaged in mail and identity theft often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DRUG OFFENSES

28.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In

addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

    d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

    e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

### VII.   **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

29.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

30.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain

14

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

32. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.    The person who was in possession of a device or had the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GARCIA or CALVILLO's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of GARCIA or CALVILLO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

33.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    CONCLUSION

34.    For all of the reasons described above, there is probable cause to believe that GARCIA has committed a violation of Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) and that CALVILLO has committed a violation of Title 18, United States Code, 1708(Possession of Stolen Mail).    There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A


                                        /S/
                            _____
                            ALYSSA RODRIGUEZ
                            Postal Inspector
                            United States Postal
                            Inspection Service


Subscribed to and sworn before me
this 22nd day of July, 2019.

        ALICIA G. ROSENBERG
_____
UNITED STATES MAGISTRATE JUDGE